IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3203-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Christopher Thomas seeks review of the final decision of the

Commissioner of Social Security denying plaintiff's application for disability benefits

under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the

ALJ erred in (1) giving little weight to the opinions of plaintiff's treating providers, Dr.

Glynn and Dr. Dimalanta; (2) in formulating plaintiff's residual functional capacity; and

(3) in finding plaintiff's subjective allegations not credible. I find that the substantial

evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled. Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

Plaintiff has prior applications for disability benefits dated 1989, 1990, two in

1991 (with a period of disability awarded from 1991 through 1997), and in 2001 (Tr. at

12). On May 15, 2006, plaintiff applied for disability benefits alleging that he had been

disabled since March 31, 2003. Plaintiff's disability stems from back pain, depression

and panic attacks. Plaintiff's application was denied on July 13, 2006. On September

4, 2008, a hearing was held before an Administrative Law Judge. On September 25, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act. He requested a review with the Appeals Council on November 13, 2008, but then filed a new application for disability benefits on February 10, 2009. SSA granted his application on March 26, 2009, finding that he had been disabled since September 26, 2008. On April 27, 2010, the Appeals Council issued an order reopening and combining all three of plaintiff's prior applications and remanding them for a new hearing and determination. Hearings were held on July 27, 2010, and September 30, 2010. On October 21, 2010, the ALJ found plaintiff not disabled. On February 16, 2012, the Appeals Council denied plaintiff's request for review.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

## IV.    *THE RECORD*

The record consists of the testimony of plaintiff, medical expert Arthur Lorber, M.D., and vocational expert Terri Crawford, in addition to documentary evidence.

Because plaintiff's arguments center on the opinions of Dr. Glynn and Dr. Dimalanta in their Medical Source Statements, I will set out those reports here:

Medical Source Statement - Physical

On May 28, 2010, Paul Glynn, D.O., completed a Medical Source Statement - Physical (Tr. at 602-603). Dr. Glynn found that plaintiff could lift and carry 5 pounds frequently and 10 pounds occasionally. He could stand or walk continuously for less than 15 minutes and for 1 hour per workday. He could sit for 15 minutes at a time and for 2 hours total per workday. He was limited in his ability to push or pull with his hands and/or feet; however, no description of the limitation was provided. He could never stoop, kneel or crawl. He could occasionally climb, balance, crouch, or reach. He could frequently handle, finger, feel, see, speak, or hear. Despite finding that plaintiff can occasionally balance, Dr. Glynn indicated that plaintiff needs a cane to walk or balance. He found that plaintiff should avoid any exposure to extreme cold, extreme heat, vibration, hazards and heights; he should avoid moderate exposure to weather and wetness/humidity; and he should avoid concentrated exposure to dust and fumes. He indicated that plaintiff needs to lie down frequently due to pain. He wrote, "spends 6-7 hours during day lying down". Finally he indicated that the sedating side effects of plaintiff's medication affect his coordination.

Medical Source Statement - Mental

On October 27, 2006, Antonio Dimalanta, M.D., completed a Medical Source Statement - Mental (Tr. at 555-556). Dr. Dimalanta found that plaintiff was not significantly limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to interact appropriately with the general public

- The ability to respond appropriately to changes in the work setting

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to set realistic goals or make plans independently of others

6

He found that plaintiff was extremely limited in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to travel in unfamiliar places or use public transportation

ALJ's Residual Functional Capacity Assessment

The ALJ found that plaintiff can lift up to 10 pounds occasionally and 5 pounds frequently; stand and walk up to 2 hours but no longer than 30 minutes at a time; sit for 6 to 8 hours per day; should be able to alternate sitting and standing at 30-minute intervals without moving away from the work station; can never crawl or kneel; should avoid climbing or exposure to significant unprotected heights; can go up no more than three steps at a time; should avoid potentially dangerous and/or unguarded moving machinery and commercial driving; cannot walk on uneven surfaces; can have no exposure to extreme vibration; should avoid extremes of cold and humidity; can no use foot controls; must have the ability to wear shoes of his choice but exclude safety boots; must have a cane for walking; and is limited to simple repetitive job instructions with no public contact and no more than minimal contact with co-workers and supervisors, i.e., proximity would be permitted but teamwork duties and responsibilities would be excluded.

The differences between the ALJ's findings and the opinions of Dr. Glynn and Dr. Dimalanta are as follows: Dr. Glynn believes plaintiff is limited to standing or walking for 1 hour per day and for less than 15 minutes at a time, but the ALJ found

that plaintiff could stand or walk for 2 hours per day and for 30 minutes at a time. Dr. Glynn believes plaintiff is limited to sitting for 2 hours per day and for 15 minutes at a time, but the ALJ found that plaintiff can sit for 6 to 8 hours per day and for 30 minutes at a time. Dr. Glynn found that plaintiff would need[1] to lie down frequently and for up to 6 or 7 hours per day due to pain and that the sedating side effects of his medication affect his coordination.

Dr. Dimalanta found that plaintiff was extremely limited in his ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and his ability to travel in unfamiliar places or use public transportation. He found that plaintiff was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and accept instructions and respond appropriately to criticism from supervisors. The ALJ found that plaintiff is limited to simple repetitive job instructions with no public contact and no more than minimal contact with co-workers and supervisors, i.e., proximity would be permitted but teamwork duties and responsibilities would be excluded.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

---

[1]Dr. Glynn actually wrote, "spends 6-7 hrs during day lying down". He did not say that plaintiff needs to lie down, only that he does lie down.

**Earnings Record**

The record establishes that plaintiff earned the following income from 1985
through 2008:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1985 | $ 222.11 | 1998 | $ 1,383.02 |
| 1986 | 959.78 | 1999 | 12,676.61 |
| 1987 | 0.00 | 2000 | 3,439.20 |
| 1988 | 5,667.82 | 2001 | 0.00 |
| 1989 | 4,274.28 | 2002 | 4,841.62 |
| 1990 | 2,785.07 | 2003 | 5,514.94 |
| 1991 | 540.46 | 2004 | 0.00 |
| 1992 | 0.00 | 2005 | 473.62 |
| 1993 | 0.00 | 2006 | 43.12 |
| 1994 | 0.00 | 2007 | 0.00 |
| 1995 | 0.00 | 2008 | 0.00 |
| 1996 | 13,627.87 | 2009 | 0.00 |
| 1997 | $ 14,152.52 | 2010 | 0.00 |

(Tr. at 302, 309, 350).

**Function Report**

In a Function Report dated June 10, 2006 (about four and a half months before
Dr. Dimalanta's Medical Source Statement was prepared), plaintiff reported that it takes
him about 20 minutes every morning to get out of bed (Tr. at 366-373). He watches
television almost all day. He alternates sitting in a chair, lying down on the couch, and
standing; and he takes a nap during the day. Plaintiff helped get his children food,
changed their diapers, and watched over them during the day. He also cared for a dog

9

and a cat. His 10-year-old son and 11-year-old son helped take care of the animals and helped change diapers. Plaintiff reported no trouble with personal care. Plaintiff said he would forget when he last took a shower and his wife would have to remind him to shower. Plaintiff fixed sandwiches for himself and his kids during the day, and his wife would do the cooking when she got home. Plaintiff did not cook beyond making sandwiches even before his alleged onset date (Tr. at 368). Plaintiff would try to do some laundry, he tried to do some dishes, but his wife would generally have to finish those tasks and clean the house.

Plaintiff reported that he would go outside five times a day to smoke or stand on the porch. When he went out, he could walk, drive a car, or ride in a car, and he was able to go out alone. Plaintiff only drove about twice a week because of his panic attacks and his medication. He was able to handle a savings account, use a checkbook, count change and pay bills. His hobbies included watching television and playing video games. He had no problems getting along with family, friends, neighbors or others.

Plaintiff's impairments affect his ability to lift, squat, bend, stand, walk, sit, climb stairs, remember, complete tasks, and concentrate. He has no difficulty with reaching, kneeling, talking, hearing, understanding, following instructions, using his hands, or getting along with others. He can walk 50 feet, he can pay attention for 20 minutes, he does not finish what he starts, but he follows written instructions fairly well. He generally gets along with everyone "just fine". Stress sometimes causes panic attacks, and he does not handle changes in routine well.

10

**Disability Report**

In a Disability Report, plaintiff indicated that he has hip/back problems, high blood pressure, depression, panic attacks, and a left heel tumor (Tr. at 375-385). He takes so much medication that he is foggy all day long. Plaintiff indicated that his alleged onset date was March 31, 2003, but that he stopped working on November 3, 2005. He was fired because he took pain killers.

**Work History Report**

Plaintiff worked as a pizza delivery driver in November 2005 (Tr. at 385). He did temporary work in parts remanufacturing from October 2005 through November 2005. He did temporary work in box manufacturing in December 2003. He was a customer service clerk at WalMart from November 2003 to December 2003. He was a floor clearer in a supermarket for one or two months in early 2003. He was an assistant manager at an oil change business from August 2002 to March 2003.

**Function Report**

In a Function Report dated March 9, 2009, plaintiff reported that he spends about an hour in bed each morning when he first gets up (Tr. at 416-423). He spends all day sitting or lying down watching television. He has to get up and walk around the house for a little bit to keep his body from tightening back up. He does that all day until it is time to go to bed. This has been his typical day for about three years, or since early 2006.

When asked what he was able to do before his condition that he cannot do now, plaintiff wrote that he used to go fishing and camping, he used to drive around on back

Case 6:12-cv-03203-REL   Document 17   Filed 09/21/13   Page 11 of 60

country roads, and he "used to be able to support myself and my family".  Plaintiff

reported that in the last 3 years he has taken about 10 baths.  He shaves about once a

month.  He only washes his hair when he takes a bath.  His mom tries to get him to take

a shower, but he does not want to.  He eats one sandwich a day.  He said that he used

to cook for his kids but he no longer does because he and his wife got a divorce.  He is

able to do a little laundry and hand wash dishes for about ten minutes; his mom was

doing the rest of the household chores because he had moved in with her.  Plaintiff

goes outside 15 to 20 times a day to smoke.  Plaintiff had stopped driving due to panic

attacks and side effects from medication.  He was able to shop in stores for soda and

snacks.  He was able to handle a savings account, pay bills and count change.  He no

longer had any hobbies, and he did not go out of the house except to see his doctor.

His impairments affect his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs,

remember, complete tasks, and concentrate.  His impairments do not affect his ability to

reach, talk, hear, see, understand, follow directions, use his hands or get along with

others.  He follows written directions well and he gets along well with others.  Plaintiff

had begun using a cane, but no doctor had prescribed it (Tr. at 422).

### B.      SUMMARY OF MEDICAL RECORDS

On October 5, 2000, plaintiff was seen at St. John's Regional Health Center for

complaints of low back and bilateral thigh and leg pain (Tr. at 582-584).  Plaintiff was 31

years of age.  He described how, in 1996, he had been lifting a heavy engine part when

his back gave out.  It did not improve and had become progressively worse.  He had

been able to maintain his employment until February 2000 when his pain became

12

unbearable.  Plaintiff had participated in physical therapy and noted some improvement.  Plaintiff reported a long-term problem with panic attacks for which he had been taking Lorazepam for some time. He was also on Paxil, an antidepressant. He used Vicodin (narcotic) for pain.  Plaintiff was smoking a pack of cigarettes per day.

Plaintiff was observed to walk with a slightly antalgic gait.  He had no back tenderness but some decreased range of motion.  Straight leg raising elicited pain bilaterally, worse on the right.  Curtis Evenson, M.D., reviewed MRI scans which showed decrease signed at L4-5 and L5-S1, a bulging disc at L4-5, and a moderately-sized central protrusion at L5-S1.  Neither of these caused any nerve root or thecal sac embarrassment. "In regard to his smoking, I counseled him on the problems with smoking associated with degenerative disc disease.  I have shown him how his cervical spine and his lower spine are already undergoing significant dessication and that he really should consider smoking cessation."  Dr. Evenson recommended a steroid injection and continued physical therapy.

On October 13, 2000, plaintiff had a steroid injection in his back (Tr. at 580), and on November 17, 2000, he saw Dr. Evenson for follow up (Tr. at 279).  Plaintiff reported that the injection increased his leg pain for about a week, then the pain was resolved for a couple days, and then it came back.  Plaintiff had another injection that day.  On December 5, 2000, plaintiff had a diagnostic discography[2] (Tr. at 578).  On December 11, 2000, plaintiff saw Dr. Evenson to go over the results of the discography (Tr. at

---

[2]Lumbar discography is an injection technique used to evaluate patients with back pain who have not responded to extensive conservative (nonsurgical) care regimens. The most common use of discography is for surgical planning prior to a lumbar fusion.

13

577).  Dr. Evenson discussed possible cervical fusion, "but again, smoking cessation would be required prior to this.  I am going to . . . have him contact Hammons for smoking cessation."

On July 10, 2001, plaintiff had an IDET[3] treatment on his spine after having stopped smoking (Tr. at 584).

On February 21, 2002, plaintiff was seen at Burrell Behavioral Health by Antonio Dimalanta, M.D., a psychiatrist (Tr. at 514).  Dr. Dimalanta noted that plaintiff was taking Lorazepam and Paxil with good control except that the Paxil was causing decreased sex drive.  "He was just operated on his back and the surgery seems to have helped."  Plaintiff agreed to try Wellbutrin to counter the sexual side effect of Paxil "since he also is trying to quit smoking."  Plaintiff had taken Wellbutrin before with good results but "did not take it long enough to try and quit smoking."  Plaintiff was having no crying spells, no suicidal or homicidal ideation and no psychotic symptoms.  He was assessed with panic disorder with agoraphobia, stable on current medication; and nicotine dependence.

On July 22, 2002, plaintiff returned to see Dr. Dimalanta (Tr. at 524-525).
Plaintiff had not started taking the Wellbutrin as directed.  "He is fearful of change, including taking another medication. . . .  He stated that the current combination has been the most helpful medication. . . .  He has been married four years now, and they

---

[3]Using "live" X-ray imaging (fluoroscopy), a doctor inserts a hollow needle containing a flexible tube (catheter) and heating element into the spinal disc. The catheter is positioned in a circle in the outer layer (annulus) of the disc and is then slowly heated to about 194°F. The heat is meant to destroy the nerve fibers and toughen the disc tissue, sealing any small tears.

14

have a two-and-a-half-year-old child. His wife has two boys from a previous marriage, ages six and seven. Chris stays at home and takes care of the kids. The last time he worked was April 2000. He does some yard work, earning maybe $75 a month." Plaintiff was smoking about 1 1/2 packs of cigarettes a day, but said he did not have the money to get psychological testing as recommended by Dr. Clarke who was treating plaintiff's back. "He applied for disability and was turned down and did not appeal it. He mostly stays at home and does some gardening. He enjoys playing video games. He socializes with a best friend. They go fishing together."

Plaintiff was observed to have good hygiene, was appropriately dressed, was calm and "quite appropriate" in his responses. He had normal range of moods with no crying. He had no paranoia, hallucinations, delusions, suicidal or homicidal ideations or plan. He was assessed with panic disorder with agoraphobia, major depression in remission, and nicotine dependence. His GAF was 63-70. Plaintiff still had Wellbutrin samples from the last appointment, and he agreed to try them.

On December 12, 2002, plaintiff saw Dr. Dimalanta for a follow up (Tr. at 513). Dr. Dimalanta discussed plaintiff's not refilling his medication prescriptions and failing to show up for appointments. He reminded plaintiff that he would be "dropped from the program for two missed appointments." Plaintiff had been working as an assistant manager at a Quik Oil Change for the past two and a half months. "It affects his back but he feels better with it." Plaintiff was getting along with his wife, who was five months pregnant.

15

Plaintiff was observed to be a little irritable -- he had called Dr. Dimalanta's office to say he was running late, and he did not like the secretary's "tone of voice." Plaintiff was not having panic attacks, crying spells, or suicidal thinking. He was assessed with panic disorder without agoraphobia. "He has a past history of major depression, but this is not a current problem." Dr. Dimalanta continued plaintiff on his same medications.

On February 2, 2003, plaintiff had x-rays of his lumbar spine and both hips due to complaints of back and hip pain (Tr. at 463-464). The plates and screws from plaintiff's previous back surgery were in good position and alignment with no evidence of malfunction or infection. His lumbar spine was normal post-operatively. He had a deformity of the right femoral head and neck, and his left hip was normal.

On February 11, 2003, plaintiff saw Patrick McShane, a podiatrist, complaining of pain on his left heel (Tr. at 490). He was assessed with neoplasm (an abnormal mass of tissue) of unknown origin. Dr. McShane recommended an ultrasound and then excision, and plaintiff agreed.

On February 13, 2003, plaintiff had an ultrasound of his left heel which revealed a mass which measured 1.3 x 1.5 x 0.6 cm (Tr. at 462). The following day plaintiff had the mass removed (Tr. at 471-472). "Has had it for approximately five years. Cannot walk on it anymore for about one week." Plaintiff listed his current medications as Flexeril (muscle relaxer) and OxyContin (narcotic pain reliever). His past medical history included only "back pain." There is no mention of depression or panic attacks, and plaintiff was clearly not taking any psychiatric medications at this time, even though

16

a few months earlier Dr. Dimalanta had admonished him to start filling his prescriptions and using them.

On February 18, 2003, plaintiff returned to see Dr. McShane for a recheck after surgery (Tr. at 490). Dr. McShane indicated the wound was healing well and the mass had been determined to be benign.

On February 25, 2003, plaintiff canceled his appointment with Dr. McShane saying that his foot was doing fine (Tr. at 490). He did not reschedule.

On March 4, 2003, plaintiff called Dr. McShane's office and reported pain in his leg near where the tourniquet was (Tr. at 490). He was told to go to the emergency room and be checked for a blood clot. He did go to the Emergency Room the same day complaining of leg pain (Tr. at 466-470). The pain "started one day ago." Plaintiff continued to smoke. On exam his leg strength, tone, and range of motion were normal. He had no tenderness or swelling. The doctor who had done the surgery two weeks earlier to remove the mass from plaintiff's heel had told him to go to the emergency room to make sure he did not have a blood clot. An ultrasound was done and there was no evidence of a blood clot. Plaintiff called Dr. McShane's office back and reported that he had had an ultrasound which showed no blood clot (Tr. at 489). "Doctor told patient he had over done which made his leg sore."

On March 5, 2003, plaintiff had half of his foot stitches taken out, and Dr. McShane indicated that it was healing well (Tr. at 489). On March 13, 2003, Dr. McShane removed the remaining stitches (Tr. at 489). He again noted the foot was healing well and told plaintiff he could return to work in one week with no restrictions.

Case 6:12-cv-03203-REL   Document 17   Filed 09/21/13   Page 17 of 60

March 31, 2003, is plaintiff's alleged onset date.

Plaintiff cancelled his follow up appointment with Dr. McShane on April 7, 2003, saying he was "doing great." (Tr. at 489).

On June 13, 2003, plaintiff saw Dr. Dimalanta (Tr. at 512). "Chris was last seen over three months ago. He missed his last appointment, since he has been working. He works at night. He is doing well on his current medication: Paxil, 25 mgs CR [continued release] and Lorazepam, 2 mg twice a day. He is aware he cannot stop the Lorazepam because he has panic attacks. His depression is also controlled by the Paxil. . . . He is married and gets along with his wife." Plaintiff's exam was normal, all observations made by Dr. Dimalanta were normal. Plaintiff was assessed with major depression in remission, and panic disorder controlled by medication.

On September 4, 2003, plaintiff saw Dimalanta for a follow up (Tr. at 522-523).

Christopher is being treated for major depression and panic attacks without agoraphobia. He has done okay on Paxil, 25 mgs CR daily; Lorazepam, 2 mgs twice a day. He has some sexual side effects from Paxil but otherwise is very happy with the combination. He will bring his wife next time to discuss this further, and I can also do an evaluation of the couple's relationship.

He is being sued because of medical bills; otherwise, there are no other legal problems.

He smokes two packs of cigarettes per day. He has tried hypnosis, patches, gum and Wellbutrin with no help.

He is applying for disability after being turned down. He is not able to hold a job. He worked a month ago and after one week he quit because his back and leg were bothering him. Before that, he worked six months as an assistant manager in a Quick Lube store. He was fired because of medical reasons.

* * * * *

18

<u>MENTAL STATUS</u>
Chris came in appropriately dressed.  He has good personal hygiene. He is alert and oriented to the three spheres. There is no psychosis, paranoia, or delusions and no suicidal thinking or plans.  He has good insight.

Dr. Dimalanta assessed major depression in remission, panic disorder without agoraphobia, and a GAF of 60 currently and 60 over the past year.  Plaintiff's medications were refilled and he was given samples of Paxil.

On February 19, 2004, plaintiff was seen by his podiatrist, Dr. McShane (Tr. at 489).  Plaintiff said he thought the mass on his heel had grown back.  Plaintiff had two small lipomas (fatty tumors) in the "fat pad" of his foot.  Dr. McShane told him he could have them removed, or he could "live with" the condition.  Plaintiff opted to try temporary padding, and Dr. McShane recommended a particular insole.

On February 23, 2004, plaintiff returned to see Dr. Dimalanta and brought his nine-year-old son (Tr. at 509).  "He reported having problems with discipline and the kids not minding including the four-year-old.  We discussed referring him to family therapy which is what he wants."  Plaintiff reported having "maybe three" panic attacks in the past three months.  "His pain medication is regulated by Dr. Clarke, his primary care physician.  It helps his pain, but he is dependent on the narcotics."  Plaintiff reported that he was "quitting smoking" and "seems to be doing okay with this."  Plaintiff had gained some weight and was getting more active.  He weighed 197 pounds.  "He is not employed.  He stays at home and takes care of the chores and the kids."  Plaintiff was observed to be dressed casually and he had good personal hygiene.  There was no psychosis, paranoia or agitation.  There was no noted anxiety, plaintiff had good

19

insight and compliance was good. Plaintiff was told to take an additional Lorazepam tablet if needed for panic attacks, and he was given an additional ten pills in his monthly prescription.

On February 26, 2004, plaintiff cancelled his appointment with Dr. McShane, the podiatrist (Tr. at 489).

On June 11, 2004, plaintiff saw Dr. Dimalanta for a follow up (Tr. at 507). Plaintiff reported that he had been gradually gaining weight because his back problem was causing him to be less active; however, plaintiff actually weighed two pounds less than he did at his last appointment four months earlier. "Taking OxyContin, 40 mgs three times a day may also be making him less active and somewhat sedated although he is not complaining of sedation." Plaintiff said that his Paxil was causing "major sexual side effects. We discussed ways to switch. He is getting along well with his wife. Except for the pain from his back problem, he feels he is doing relatively okay." Dr. Dimalanta observed that plaintiff showed normal range of mood without crying or having any suicidal thinking, there was no psychosis, insight was good. He was assessed with panic disorder with agoraphobia, although it is unclear why the previous diagnosis of "without agoraphobia" suddenly changed to "with agoraphobia." He was also diagnosed with major depression and "situational stressors" of medical problems and sexual side effects were noted to be present. Dr. Dimalanta suggested switching from Paxil to Zoloft and gave plaintiff samples of both.

Three weeks later, on July 2, 2004, plaintiff returned to see Dr. Dimalanta (Tr. at 505). Although at his last appointment three weeks earlier he said he and his wife were

getting along fine, on this appointment he indicated that he and his wife were struggling, having a lot of conflict. "Chris is very happy with taking Zoloft, 50 mgs in the morning. He is not having sexual side effects, unlike when he was taking Paxil." Dr. Dimalanta suggested counseling but plaintiff said his wife would not agree to that. "One problem is finances and he is looking for a job. He thinks this will help them a lot." Plaintiff weighed 209 pounds on this visit -- 14 pounds heavier than three weeks earlier."He is feeling better and does not have depressive complaints or suicidal thinking. There is no psychosis or paranoia." Plaintiff was assessed with, "Panic Disorder, Major Depression, recurrent, responding well to the above medication." Plaintiff was continued on his same medications at the same dosages.

On September 24, 2004, plaintiff returned to see Dr. Dimalanta (Tr. at 503). Plaintiff said he felt better when he was taking Paxil and Zoloft. "He mostly stays at home, taking care of their kids while his wife works. He lost his job after having back surgery." This is a curious statement since plaintiff's back surgery occurred more than three years earlier (July 10, 2001) and Dr. Dimalanta had noted in three different medical records which post-date plaintiff's back surgery that plaintiff was working. Plaintiff's weight was 192 on this visit. He was dressed appropriately and showed good hygiene. He was cooperative and polite, responded appropriately to questions, was completely oriented, had no crying spells or suicidal thinking, no psychosis or paranoia, and he had good insight. His affect was "somewhat constricted," otherwise his exam was perfectly normal. Dr. Dimalanta gave plaintiff samples of Zoloft and told him to

21

increase his dosage from 50 mg to 75 mg in the morning for one week to see if he could tolerate it.

Four months later, on January 27, 2005, plaintiff returned to see Dr. Dimalanta (Tr. at 502). "Chris was last seen on 9/24/04, He missed his last appointment. He tried 100 mgs of Zoloft but he could not tolerate it. He is not sure how he feels about it. He is back to taking 50 mgs in the morning and it is helping his anxiety and depression." Plaintiff stated that he was still taking the same amount of pain medication. "It helps his back problem. . . . He is planning to attend OTC and study computer programming. Finances is a problem but other day-to-day stressors are tolerated." Plaintiff weighed 196 pounds. He was casually dressed and showed good hygiene. He brought his five-year-old son with him. "He is calm and predominantly happy. There is no crying, and he is not having suicidal thoughts. There is no psychosis. Insight is good." He was told to return in a month.

About three months later, on April 12, 2005, plaintiff returned to see Dr. Dimalanta (Tr. at 501). "He does not like the effect of Zoloft. He cannot raise it more than 50 mgs and he seems to be having more edginess from it. We reviewed other medications and he wants to go back to taking Paxil. The sexual side effect is probably not from the medication but more relationship issues. . . . Relationships with family, situations and children are stressful." Plaintiff was described as "laid back." He was appropriately dressed and showed good hygiene. He was calm, polite and cooperative, readily sharing information. "He sometimes shows mild anxiety." He weighed 195 pounds. "There is no psychosis, paranoia, crying spells or suicidal thinking. Insight is

good." Plaintiff was told to taper off Zoloft and restart Paxil and to come back in a month.

Three and a half months later, on July 28, 2005, plaintiff returned to see Dr. Dimalanta (Tr. at 499). He had been on Paxil, but "he did better on the CR strength." Dr. Dimalanta explained the difference between Paxil and continued release Paxil. "He does odd jobs, like fixing lawn mowers. He took a test at OTC and scored very high. He is considering going back to school. . . . He is getting along well with his wife and they have been married for seven years now. The last time he used alcohol was fourteen years ago." Plaintiff weighed 193 pounds. He was dressed appropriately and showed good personal hygiene. "He is alert and readily shares information. There are no crying spells, suicidal thinking, paranoia, or delusions. Insight is good." No abnormal observations were noted. He was assessed with panic disorder with agoraphobia and major depression, in remission. Dr. Dimalanta switched plaintiff from Paxil to Paxil CR and told him to come back in three months.

On October 20, 2005, plaintiff returned to see Dr. Dimalanta (Tr. at 498). "He is doing well with his medication and has no complaints from taking Paxil, 25 mg CR, and Lorazepam, 2 mg. three times a day as needed (generally takes two to two and a half a day). I reviewed his psychosocial systems, and stressors are tolerated. He is looking for a job and has an interview scheduled today. He plans to work in a transmission remanufacturing plant if he gets accepted. He is aware of his back problem, and we discussed to make sure he doesn't need to be lifting heavy objects. . . . His family life is mildly a stressor because his kid is needing possible psychiatric care. We discussed

how to refer his kid to the Children's Program, which was done."  Plaintiff weighed 188 pounds.  He was casually dressed and showed very good hygiene. He was relaxed and oriented times three.  "No problem with memory, paranoia, delusions, or hallucinations. No crying spells or suicidal thinking.  Insight is good."  No abnormal observations were noted.  He was assessed with panic disorder with agoraphobia and major depression in remission.  "He has responded well to the above medicine. Stress is tolerated."  He continued plaintiff on his same medications and told him to come back in three months.

On February 6, 2006, plaintiff returned to see Dr. Dimalanta (Tr. at 497).  He was doing well with his medication, and he said he was still on the same medication for his back pain.  "He is getting along with his wife.  Review of his psychosocial system showed he is tolerating daily stress.  He is not working.  The most difficult problem is learning his doctor was dying of lung cancer. This is devastating to him, and he has been feeling sad about the situation."  Plaintiff weighed 190 pounds.  He was appropriately dressed and showed good hygiene.  "He got teary eyes discussing above stressor but otherwise was predominantly happy, showing normal range of mood.  He has no suicidal or homicidal thinking or plan. Thought processes are clear, without paranoia, delusions, or hallucinations.  Insight is good."  He was assessed with panic disorder with agoraphobia and major depression "responding very well with above medicine. . . .  We agreed he has done well with the above medication."

About three weeks later, on March 2, 2006, plaintiff saw Dr. Glynn for the first time and reported back pain (Tr. at 528).  Plaintiff had been seeing Dr. Clarke.  Plaintiff

24

reported trouble sitting.  Plaintiff was assessed with hypertension and lumbar disc disease.  He was prescribed medication.  No exam was noted.

On March 30, 2006, plaintiff returned to see Dr. Glynn (Tr. at 528).  Plaintiff said that the OxyContin was no longer helping his pain but he would get sick when he tried to stop taking them.  Dr. Glynn prescribed Norco, another narcotic pain medicine.  No exam was noted.

On May 1, 2006, plaintiff returned to see Dr. Glynn (Tr. at 527).  "Extra Norco has helped a lot."  Dr. Glynn refilled plaintiff's narcotic pain medicine.  The record is four lines long and does not include any observations or any exam.

On May 15, 2006, plaintiff filed applications for disability.

On May 30, 2006, plaintiff returned to see Dr. Glynn (Tr. at 527).  He complained about a spot on his throat that he wanted checked out.  His throat hurt when he tried to sing or use a loud voice, not all the time and it did not hurt to swallow.  He was referred to an ENT specialist.  With regard to his back pain, "says Lidoderm[4] patch just didn't help.  Will continue with oral meds."

On June 20, 2006, plaintiff saw Dr. Dimalanta after not having seen him for the past 4 1/2 months (Tr. at 553).  "He is doing relatively well on his medication, Lorazepam, 2 mg, three times a day, and Paxil, 25 mg CR. . . .  He has developed avoidance as a personality pattern.  He is not able to work and is applying for disability.

---

[4]Lidoderm patches contain Lidocaine which helps to reduce sharp/burning/aching pain as well as discomfort caused by skin areas that are overly sensitive to touch. Lidocaine belongs to a class of drugs known as local anesthetics. It works by causing a temporary loss of feeling in the area where you apply the patch.

He is unable to drive without his wife, and even then, he gets very nervous. . . . He has

four children, two of his own, and two from his wife's previous relationship. They are

getting along. He changed doctors and is consulting with Dr. Glynn. His OxyContin

and Hydrocodone are still the same medication." Plaintiff weighed 194 pounds. He

was dressed appropriately and showed good personal hygiene. He did not have any

agitation, paranoia, delusions or hallucinations; he had no suicidal or homicidal thinking

or plan. His insight was good. There were no abnormal observations or findings noted.

Plaintiff was assessed with panic disorder with agoraphobia and major depression

"responding well to Paxil." "He is disabled and will be unable to work in any full-time

job." This appointment occurred approximately one month after plaintiff filed his

application for disability benefits. Dr. Dimalanta kept plaintiff on his same medications

at the same dosages and told plaintiff to return in three months.

On June 27, 2006, plaintiff saw Dr. Glynn for a recheck on back pain (Tr. at 548).

Plaintiff said he wanted to quit smoking. The only note beyond plaintiff's statement that

he wanted to quit smoking was "cancelled appt - didn't have cash for copay." Dr. Glynn

refilled plaintiff's Norco and Oxycontin, both narcotics.

On July 13, 2006, C. K. Bowles completed a Psychiatric Review Technique at

the request of SSA (Tr. at 529-541). Dr. Bowles found that plaintiff's mental impairment

was not severe. That same day plaintiff's disability applications were denied initially.

On July 25, 2006, plaintiff went to see Dr. Glynn "with lower back pain" and to

have a Medical Source Statement completed (Tr. at 547). No exam was performed, no

observations were noted. Dr Glynn refilled plaintiff's narcotic pain medicine and

completed the Medical Source Statement Physical (Tr. at 543-544, 547).  He found that plaintiff could lift and carry 15 pounds occasionally and 5 pounds frequently, stand or walk for 2 hours per day and for 15 minutes at a time, sit for 4 hours per day and for 45 minutes at a time, and that he was limited in his ability to push or pull.  He found that plaintiff could only occasionally reach, even though in a Function Report completed five weeks earlier plaintiff indicated he has no difficulty reaching.  He found that plaintiff needs to lie down during the day.  When asked how often, he wrote, "4 hrs of 8 hr day" and when asked for the duration he wrote, "1 hr" -- I can only assume he meant plaintiff would need to lie down for an hour at a time four times per day.  He indicated that plaintiff takes sedating medication and he would therefore suffer a decrease in concentration, persistence, or pace.  He also indicated that his findings were based on "medical history, clinical findings (such as the result of physical or mental status examinations), laboratory findings (such as blood pressure, x-rays), diagnosis (statement of disease or injury base[d] on its signs and symptoms), and treatment prescribed with response and prognosis."  However, none of these things appear in the few medical records Dr. Glynn had completed to date, with the exception of Dr. Glynn's prescribing pain medication.

On August 22, 2006, plaintiff saw Dr. Glynn for a follow up on his back pain and complained of "no sleep" (Tr. at 547).  The medical record states in its entirety:  "No new issues, back stable - not working, awaiting disability hearing."  His narcotic pain prescriptions were refilled.

Case 6:12-cv-03203-REL   Document 17   Filed 09/21/13   Page 27 of 60

On September 19, 2006, plaintiff saw Dr. Glynn (Tr. at 546, 569). The medical record reads in its entirety: "When I walk in the room he is standing. 'I couldn't sit any longer.' Walks stiffly. Gets in and out of chair using arms for assist. Have refilled chronic meds."

On October 17, 2006, plaintiff saw Dr. Glynn (Tr. at 569). His four-line medical record is illegible except that he was discussing plaintiff's 2003 surgery. He refilled plaintiff's narcotic pain medications.

On October 26, 2006, plaintiff saw Dr. Dimalanta for a follow up (Tr. at 552). "I reviewed his psychosocial system and he is basically homebound, taking care of kids. They have four children and the youngest is three. Three of them are in school during the day. It has been over two years since he tried to go back to work and he was not able to do so. He can get jobs and hold them for a few weeks. He has panic attacks and severe back problems interfere with his ability to work. Over the years he developed avoidance. He no longer drives a car, since he gets panicky in spite of taking medication. He takes Lorazepam, 2 mg three times a day and is not misusing it. His other medicine is Paxil, 25 mgs CR. . . . He was made aware of being physically dependent on Lorazepam. He gets along with his wife who is very supportive and helpful. She works and they have role reversal, which is okay with him. . . . He is still applying for disability." Plaintiff weighed 201.7 pounds. He was alert and fully oriented, he had normal range of mood, he had no psychosis, paranoia, delusions, suicidal or homicidal thinking. His memory and insight were good. The only abnormal observation was that plaintiff was "mildly anxious." He was assessed with panic disorder with

28

agoraphobia and major depression. "He is responding well with medicine. Axis II with avoidance and Cluster C are interfering with his functioning. He quit driving a car because of anxiety. His back problems makes [sic] him have problems in daily functioning and he will not be able to work in any full-time job. His concentration is also affected." Dr. Dimalanta kept plaintiff on the same medications at the same dosages.

The following day, Dr. Dimalanta completed the Medical Source Statement Mental that is the subject of plaintiff's argument in this appeal (Tr. at 555-556). The specific findings are set out on pages 5 through 8 of this order. Despite observing the day before that plaintiff's memory was good, Dr. Dimalanta rated plaintiff "markedly" limited in his ability to remember detailed instructions and "moderately" limited in his ability to remember locations and work-like procedures.

On November 14, 2006, plaintiff saw Dr. Glynn who noted that plaintiff walked with an antalgic gait and "slow", "guards back." He noted that the weather affected his hip pain into his leg "today." No examination was performed. Plaintiff's narcotic medications were refilled.

On December 12, 2006, plaintiff returned to see Dr. Glynn (Tr. at 570). The three-line record says that weather affects his back, "can't stand very long." No examination was performed. Dr. Glynn refilled plaintiff's narcotic pain medications.

On January 8, 2007, plaintiff saw Dr. Glynn (Tr. at 571). Again the record is only a few lines long, is somewhat illegible, discusses pharyngitis and myalgias. No examination was performed. The same narcotic pain medications were refilled.

On February 2, 2007, plaintiff saw Dr. Dimalanta (Tr. at 591). "He will have problems maintaining work because of panic attacks, depression and Cluster C personality. He is also getting pressure from his wife who expects a lot more active participation and cannot understand his avoidance. We will meet next time to include his wife so I can explain this problem." Plaintiff weighed 198 pounds. He was casually dressed and showed good hygiene. He was "very laid back" with no crying spells or suicidal thinking. There was no psychosis, paranoia or delusions. Insight was "better" although at his last appointment Dr. Dimalanta noted that his insight was "good." The only abnormal observation was that plaintiff was "mildly anxious." Despite having conducted no testing, Dr. Dimalanta added a new diagnosis: Personality Disorder, not otherwise specified." He noted that "Cluster C is interfering with maximum benefit of treatment. He is mentally disabled." Because plaintiff complained that Paxil was not working as well, Dr. Dimalanta increased his Paxil by 12.5 mg and told him to return in a month.

On February 5, 2007, plaintiff saw Dr. Glynn (Tr. at 571). "Weather has significantly affected pain and mobility." No examination was performed. Plaintiff's same narcotic pain medications were refilled.

Dr. Glynn's medical records include a note dated February 26, 2007, which says only, "Referral to Martin Center on March 7 @ 11:00 mailed letter" (Tr. at 571). Martin Center for Diagnostic Imaging is in Cox Health in Springfield.

On March 6, 2007, plaintiff saw Dr. Glynn (Tr. at 568). The entire record states as follows: "Reminded of MRI at Martin Center tomorrow. Refilled chronic meds."

30

On April 3, 2007, plaintiff saw Dr. Glynn (Tr. at 568). The record says, "Today just needs refills meds." He refilled plaintiff's narcotic pain medications.

On May 1, 2007, plaintiff saw Dr. Glynn to go over his MRI (Tr. at 572). "MRI OK. Disc OK." He refilled plaintiff's narcotic pain medications.

On May 29, 2007, plaintiff saw Dr. Glynn (Tr. at 572). Dr. Glynn wrote, "moving stiffly" and then refilled plaintiff's narcotic pain medications.

On June 26, 2007, plaintiff saw Dr. Glynn (Tr. at 567). The two-line record says that plaintiff was doing pretty well. His narcotic pain medications were refilled.

On July 18, 2007, plaintiff saw Dr. Glynn (Tr. at 567). The two-line record says that plaintiff was "doing pretty well - refilled meds."

On July 26, 2007, plaintiff saw Dr. Dimalanta (Tr. at 590). "He was last seen on 2/2/07. He canceled two appointments and missed one. We discussed compliance and keeping his appointments. We defined the rules to continue treatment." Dr. Dimalanta noted that plaintiff was doing well on Paxil CR and Lorazepam. "There is no change in his medicine from what it was on 2/6/06. . . . He is still waiting for his disability appeal. He cannot work because of his back problems. his panic attacks and depression are helped by his current medicine. . . . He stays at home and takes care of four kids. He cannot lift heavy things. His wife works at Wal-Mart and finance is a struggle but they are making it with difficulty. He gets along with his wife." Dr. Dimalanta observed that plaintiff was alert and oriented times three, he was calm without depressive symptoms, he had no suicidal or homicidal thinking or plans. There was no psychosis or paranoia. Memory, judgment and insight were good. His assessment was: "Major Depression,

31

recurrent and Panic Disorder with Agoraphobia, responding well with medicine. Back problem makes him disabled.  Stressors are tolerated."

On August 21, 2007, plaintiff saw Dr. Glynn (Tr. at 573).  "[illegible] has been OK. Back is better because lawn mower and weed eater are broken."  That is the complete medical record. Dr. Glynn refilled plaintiff's narcotic pain medications.

On September 18, 2007, plaintiff saw Dr. Glynn (Tr. at 573).  He noted that plaintiff complained of chronic pain.  Much of the record is illegible, but it does say "disability application" and "located low back hips" and "alert adult - friendly - cooperative - good mood - pleasant affect" and "limited ROM [range of motion] L/S [lumbosacral]" and "full ROM flexion/extension but painful" and "adjusts position while sitting."  His assessment included "failed back [illegible] - nerve root compression [illegible]".

On October 16, 2007, plaintiff saw Dr. Glynn (Tr. at 566).  "Doing OK - just refills. Has no new issues."  Plaintiff's narcotic pain medications were refilled.

On November 13, 2007, plaintiff saw Dr. Glynn (Tr. at 566).  The entire record consists of the following:  "Doing well".

On December 11, 2007, plaintiff saw Dr. Glynn (Tr. at 574).  The entire record says, "No new issues - stiff & sore" and then he refilled plaintiff's narcotic pain medications.

On January 8, 2008, plaintiff saw Dr. Glynn (Tr. at 574).  The record is two lines long and says, "weather has stiffened up [illegible] over all [illegible]."  He assessed

32

degenerative joint disease of the lumbar spine and sciatica and refilled plaintiff's same narcotic medications.

On February 5, 2008, plaintiff saw Dr. Glynn (Tr. at 565). Plaintiff said he wanted to get off oxycodone. The few lines of the medical record are illegible. Dr. Glynn refilled plaintiff's narcotic pain medicine, including oxycodone.

On March 4, 2008, plaintiff saw Dr. Glynn (Tr. at 575). The entire record says, "Discussed means of cutting back." But then he refilled plaintiff's same narcotic pain medications.

On April 1, 2008, plaintiff saw Dr. Glynn (Tr. at 575). The entire record says, "Here for refills. Doing OK. Gave refills."

On April 29, 2008, plaintiff saw Dr. Glynn (Tr. at 564). Plaintiff discussed his stool. No examination was performed. Plaintiff was assessed with degenerative joint disease, sciatica, fibromyalgia and chronic diarrhea. His narcotic pain medications were refilled.

On May 27, 2008, plaintiff saw Dr. Glynn (Tr. at 564). He weighed 197 pounds. Plaintiff reported continued diarrhea. No exam was performed. He was assessed with degenerative joint disease, sciatica, fibromyalgia, and chronic diarrhea. His narcotic pain medications were refilled.

On June 24, 2008, plaintiff saw Dr. Glynn (Tr. at 563). The record reads in its entirety: "[H]as colonoscopy tomorrow. Has chronic constipation." Dr. Glynn refilled plaintiff's narcotic pain medication.

On July 22, 2008, plaintiff saw Dr. Glynn (Tr. at 563). The three-line record discussed the fact that plaintiff had a colonoscopy. Dr. Glynn refilled plaintiff's narcotic pain medications.

September 4, 2008, was plaintiff's first administrative hearing.

On September 16, 2008, plaintiff saw Dr. Glynn for a recheck on anxiety and chronic pain (Tr. at 599). "Discussed meds and testosterone. He describes symptoms of androgynous. Refilled meds."

On September 25, 2008, the ALJ issued an unfavorable decision.

On October 19, 2008, plaintiff saw Dr. Glynn for a recheck on back pain (Tr. at 599). "Needs refills. Pretty good result. No problems." There is one more sentence in this record about finances.

On November 11, 2008, plaintiff saw Dr. Glynn for a recheck on anxiety and chronic pain (Tr. at 598). "Doing well. He did run out of Lorazepam two days early." Plaintiff's medications were refilled. Ordered back brace. Wrote note for workshop with limitations [illegible] work. Should be able to handle workshop."

On December 9, 2008, plaintiff saw Dr. Glynn (Tr. at 598). His entire record reads as follows: "Cannot afford Oxycontin will continue others."

On January 6, 2009, plaintiff saw Dr. Glynn (Tr. at 597). He reported back pain and anxiety. The entire record reads as follows: "No new issues. Got back brace. Feels good." He refilled plaintiff's pain medication.

On February 3, 2009, plaintiff saw Dr. Glynn for back pain and anxiety (Tr. at 597). "Doing well. Tired of cold." The other two lines of this medical record are

somewhat illegible: "[illegible] of meds [illegible] about back pain." He did not perform

an exam, and he did not make any abnormal observations. He did write on a "patient

instruction" pad that plaintiff has severe pain in his lumbar spine, that he has

"significantly reduced motion in his low back". He wrote, "In spite of, or because of, the

multiple surgeries he has an arachnoiditis-type[5] pain of chronic nature that limits his

ability to bend, lift, twist or pull and requires several periods of rest each day. He is

totally disabled and unemployable." (Tr. at 596).

On February 10, 2009, plaintiff filed the instant applications for disability benefits,

even though he had requested review by the Appeals Council in his previous case in

November of 2008 and that case was still pending.

On March 3, 2009, plaintiff saw Dr. Glynn "with depression and chronic pain" (Tr.

at 595). Plaintiff said he was losing his insurance soon and would like to wean off of

oxycontin. Dr. Glynn switched him to oxycodone. Plaintiff said he was getting divorced

and cannot sleep. "Will try Seroquel" (treats bipolar disorder and schizophrenia). Dr.

Glynn also prescribed Lexapro.

On March 26, 2009, plaintiff's application for disability benefits was granted by

SSA, with a finding that he had been disabled since September 26, 2008.

---

[5]Arachnoiditis is a pain disorder caused by the inflammation of the arachnoid, one of
the membranes that surrounds and protects the nerves of the spinal cord. It is
characterized by severe stinging, burning pain, and neurological problems. According
to medical expert Dr. Arthur Lorber who testified at the hearing, arachnoiditis is "a very
serious diagnosis . . . [and] can only be determined by imaging studies such as an MRI
and CT scan, it cannot be determined even with x-rays." (Tr. at 84).

35

On March 31, 2009, plaintiff saw Dr. Glynn for a recheck on anxiety and chronic pain (Tr. at 613). "Pain less on new meds. Lexapro helping. He says he is happy now." That is the entire medical record.

On April 28, 2009, plaintiff saw Dr. Glynn for a recheck on back pain and for blood work (Tr. at 613). "Doing well. Got his disability. Will continue meds." That is the entire record.

On May 21, 2009, plaintiff saw Dr. Glynn with complaints of fatigue, depression and back pain (Tr. at 612). Plaintiff said he was "very fatigued, loss of interest in everything, has short term memory problems, disturbed sleep, fatigue, malaise." Dr. Glynn decided to check plaintiff's testosterone level.

On June 16, 2009, plaintiff saw Dr. Glynn to go over labs (Tr. at 611). Plaintiff had high LDL, low HDS, low free testosterone, high triglycerides. Plaintiff was still smoking two packs of cigarettes per day. Dr. Glynn prescribed cholesterol medication.

On June 24, 2009, plaintiff saw Dr. Glynn for a recheck on depression and chronic pain (Tr. at 611). Plaintiff said he had felt a result from the testosterone medication and he was told to continue using it.

On July 22, 2009, plaintiff saw Dr. Glynn who wrote only "doing well" (Tr. at 610).

On August 19, 2009, plaintiff saw Dr. Glynn for chronic pain and anxiety (Tr. at 610). Dr. Glynn wrote only, "Doing well. Refills meds."

On September 16, 2009, plaintiff saw Dr. Glynn for chronic pain and depression (Tr. at 610). Dr. Glynn wrote only, "Doing well on meds. Continue on at present."

36

On October 13, 2009, plaintiff saw Dr. Glynn complaining of a spot on his nose, chronic pain and anxiety (Tr. at 609). The one-sentence record is illegible.

On November 10, 2009, plaintiff saw Dr. Glynn (Tr. at 609). The entire record is two lines long: "Doing well. No new issues. Current meds seem to be helping."

On December 8, 2009, plaintiff saw Dr. Glynn (Tr. at 608). Plaintiff complained of numbness in his leg. Dr. Glynn's two-line record begins with "advised that" and the rest of the sentence is illegible.

On January 5, 2010, plaintiff saw Dr. Glynn for stress and back pain (Tr. at 608). Only the phrase "no new issues" is legible in this three-line record.

On February 2, 2010, plaintiff saw Dr. Glynn for a recheck on chronic back pain (Tr. at 607). The entire record consists of the following sentence: "Refills meds. Needs tested for residual functional capacity." There is no indication that any testing was done.

On March 2, 2010, plaintiff saw Dr. Glynn (Tr. at 607). This is another one-line medical record: "Very stiff & sore. Hasn't been walking due to cold."

On March 30, 2010, plaintiff saw Dr. Glynn for a recheck on chronic pain and anxiety (Tr. at 606). "Doing well. Feels good. Back better." That is the entire record.

On April 27, 2010, plaintiff saw Dr. Glynn for a recheck on back pain and depression (Tr. at 606). Plaintiff said his tailbone was hurting "today. Has been hurting off and on." There is no further record - no exam, no testing. That same day, the Appeals Council reopened plaintiff's previous case and remanded all of his pending applications for a new hearing and determination.

On May 25, 2010, plaintiff saw Dr. Glynn for a recheck on back pain and anxiety (Tr. at 605). The entire record is one sentence long and appears to end in mid-sentence: "Doing well should be getting".

On May 28, 2010, plaintiff returned to see Dr. Glynn for disability paperwork (Tr. at 605). Dr. Glynn completed the Medical Source Statement Physical which is the subject of this appeal and is described on page 5 of this order.

On June 22, 2010, plaintiff saw Dr. Glynn for a recheck on back pain (Tr. at 615). Plaintiff said he was "really stiff & sore." Dr. Glynn continued plaintiff on his same medications.

On July 19, 2010, plaintiff called Dr. Glynn's office and said his narcotic pain medication had been stolen (Tr. at 615). Dr. Glynn refilled the medication.

The following day, plaintiff saw Dr. Glynn for a recheck on chronic pain (Tr. at 615). His blood pressure was taken (it was normal) -- there is nothing else in this record besides diagnoses of depression, degenerative joint disease of the lumbar spine, and osteoarthritis.

On July 27, 2010, plaintiff testified at another administrative hearing.

On August 16, 2010, plaintiff had x-rays of his hip and back taken at St. John's Hospital (Tr. at 619-620). Mark Wilson, M.D., noted plaintiff's surgical metallic hardware from his earlier back surgery, the deformity of the right femoral head that had been present since childhood, and "mild osteoarthritic changes" involving the right

acetabulum.[6]  "I see no evidence of fracture or bone destruction.  Vacuum

phenomenon[7] is present in the right SI [sacroiliac] joint[8] consistent with degenerative

changes."

On August 17, 2010, plaintiff saw Dr. Glynn and said he had hurt his left

shoulder (Tr. at 635).  The record says, "Low back has been pretty good."  The rest of

this brief record is illegible except that it appears Dr. Glynn prescribed Toradol, a non-

steroidal anti-inflammatory, in addition to plaintiff's other medications.

On August 25, 2010, plaintiff saw Charles Ash, M.D., for a consultative exam at

the request of the administrative law judge (Tr. at 631-632).  Plaintiff said he had been

experiencing lower back pain radiating into the toes of both feet for the past 13 years.

His pain is aggravated by bending, lifting and walking.  Plaintiff reported smoking a pack

of cigarettes per day.

Plaintiff was described as a "well developed man who stands erect and walks

---



[6]

[7]Dr. Lorber, the medical expert who testified at the hearing, stated that vacuum
phenomenon means there is some gas within the joint -- it is not a severe finding and
does not add any additional limitations to an arthritic hip (Tr. at 41-42).



[8]

with a limp favoring the right leg.  He is unable to walk on the heel of the left foot due to previous heel pad surgery."  His leg lengths were equal, even though plaintiff had told Dr. Ash that his right leg was shorter due to his Perthes disease (chronic deformity of the right femoral head).  Plaintiff was able to squat 25 percent normally.  He had moderate difficulty arising from the exam table, but no difficulty arising from the chair, dressing or undressing.  Plaintiff had no abnormality in his cervical spine.  He had tenderness in the sacrum and guarded[9] motion but no spasm or deformity.  Right and left lateral bending and right and left rotation were normal.  Plaintiff could flex (bending forward at the waist) 30 degrees (normal is 90) and he could extend (bending backwards at the waist) 10 degrees (normal is 30).

Plaintiff had normal range of motion in his upper extremities except pain was produced in the right shoulder with extremes of motion.  There was no weakness, deformity or atrophy. Grip and pinch were strong in both hands.

---

[9]Guarding is an involuntary reaction to protect an area of pain (as by spasm of muscle on palpation of the abdomen over a painful lesion).

Plaintiff had limited motion in his right hip -- he could flex[10] 90 degrees (normal is 130). Abduction[11] was 30 (normal is 40), adduction was 10 (normal is 20), external rotation was 20 (normal is 50) and internal rotation was 10 (normal is 40).

Dr. Ash assessed lumbosacral fusion and Perthes disease right hip with degenerative arthritis. He completed a Medical Source Statement (Tr. at 625-630) finding that plaintiff could perform activities like shopping; traveling without a companion for assistance; ambulating without using a wheelchair, walker, or two canes or crutches; walking a block at a reasonable pace on rough or uneven surfaces; using standard public transportation; climbing a few steps at a reasonable pace with the use of a single hand rail; preparing simple meals; caring for his personal hygiene; and handling or using paper files. He found that plaintiff could lift and carry up to 10 pounds occasionally. He found that plaintiff could sit for 2 hours at a time and for 8 hours per day, walk or stand for 1 hour at a time and for 2 hours per day, and that plaintiff does

---



41

not need a cane to ambulate. He found that plaintiff could frequently reach in all directions, handle, finger, feel, push or pull. He found that plaintiff could occasionally use his feet for operation of foot controls. He found that plaintiff could occasionally climb, balance, stoop, kneel, crouch or crawl and that he could occasionally have exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, extreme temperatures, and vibrations. Plaintiff could occasionally drive.

On September 3, 2010, plaintiff saw Dr. Glynn complaining of left shoulder pain (Tr. at 634). He said his elbow "really hurts today as well." Dr. Glynn indicated that he examined plaintiff's arm and plaintiff had pain in his shoulder and elbow. Dr. Glynn gave plaintiff trigger point injections. He assessed tendinitis in the elbow, degenerative joint disease of the shoulder, and anxiety. On September 20, 2010, Dr. Glynn set up an appointment for plaintiff to have an MRI (Tr. at 634).

On September 23, 2010, plaintiff had an MRI of his left shoulder which revealed supraspinatus tendinopathy[12] without a tear, and a trace amount of fluid in the joint.

September 30, 2010, was plaintiff's follow-up administrative hearing.

On October 21,2010, the ALJ found plaintiff had not been disabled at any time from his alleged onset date to the present.

---

[12]



42

*C.* *SUMMARY OF TESTIMONY*

There are multiple transcripts of administrative hearings in the file.

September 4, 2008, hearing

This hearing was held in connection with plaintiff's applications which were filed in 2006 (Tr. at 97). The ALJ noted that plaintiff had filed applications in 1989, 1990, two in 1991, 1997 and 2001 (Tr. at 97). None of those cases were being reopened (Tr. at 97).

**1.      Plaintiff's testimony.**

Plaintiff was born in 1969 (Tr. at 98). He graduated from high school (Tr. at 98). He is right handed (Tr. at 98). He does not have a driver's license (Tr. at 99). He used to have one but it was suspended (Tr. at 99). If he had a valid license and a car, plaintiff would not be able to drive because of his medical condition (Tr. at 99).

Plaintiff's Paxil causes him to get sick to his stomach if he goes outside and it's over 90 degrees (Tr. at 100). He takes Lorazepam for panic attacks and that makes him sleepy (Tr. at 100, 109). He takes three pain medications which all have a "sleepy effect" and can make him feel like he is floating on the clouds (Tr. at 100). The way his narcotic medicine is designed, they "kind of make you feel good and kind of forget about the pain, but you also -- your mind's kind of taking a little trip down la-la land" (Tr. at 110).

Plaintiff was on disability in the 1990s and that ended because he went back to work at Peterbilt (Tr. at 100). He was at that job for about a year and a half (Tr. at 101). Plaintiff left that job because he hurt his back (Tr. at 101). He lifted a heavy part off a

43

shelf and when it came off the shelf and went into his arms, it was too heavy and his back gave out and "it went to the floor" (Tr. at 101). Plaintiff had back surgery some years later, but it did not help (Tr. at 101). Since the surgery, he has had pain in his back 24 hours a day (Tr. at 101). The pain goes down his legs and into his feet (Tr. at 101, 104). Since his surgery, he has not participated in any kind of pain management program -- his doctor has not recommended anything to him (Tr. at 112).

Walking and bending exacerbate his pain (Tr. at 102). He can walk about 50 feet and then has to lean on something (Tr. at 102). Plaintiff does not know whether sitting hurts his back or whether it would just hurt regardless of what he was doing (Tr. at 102). In a straight-back chair with his feet on the floor, plaintiff could sit for maybe ten minutes before feeling pain (Tr. at 103). He cannot get up from a seated position without holding onto something to pull himself up (Tr. at 104). On average his back pain is about a 6 out of 10 (Tr. at 102). Twisting makes the pain worse, and plaintiff cannot lift and carry anything anymore (Tr. at 103). Plaintiff's previous doctor put him on a lifetime lifting limit of ten pounds (Tr. at 103).

Plaintiff takes all of his pain medication like he is supposed to, and he alternates lying down, sitting up, and standing up (Tr. at 104). He lies down about twice a day for an hour each time, and sometimes he naps for two or three hours (Tr. at 104, 110). Plaintiff could not stand at a table to do assembly work because he cannot stand more than ten minutes without holding onto something or leaning on something (Tr. at 105).

Plaintiff has had problems with his right hip since childhood (Tr. at 105). His ball socket is half worn off so he does not have the same range of motion in his right leg as

44

he does in his left (Tr. at 106).  Plaintiff's hip causes him problems with squatting down, kneeling and crawling (Tr. at 106).

Plaintiff had a tumor taken out of his left heel in February 2004 (Tr. at 106).  It has already grown back and his doctor told him to come back and have this one cut out but the surgery was painful and plaintiff's not quite ready to have that one cut out yet (Tr. at 106).  It stings and burns when plaintiff walks or stands on his left foot (Tr. at 106).  The only relief he gets is from his pain pills (Tr. at 107).  Plaintiff can only wear tennis shoes -- he used to wear cowboy boots but he cannot wear those or hiking boots anymore (Tr. at 107).  Boots are too heavy and cause pain in his hip (Tr. at 107).

Since plaintiff has been unable to work, he has become depressed and does not care whether tomorrow comes or not (Tr. at 107).  Although plaintiff has good days and bad days, he has about 25 bad days per month (Tr. at 107).  Plaintiff is depressed, he does not feel like doing anything, he is withdrawn, he doesn't spend time with family, and his wife kicked him out (Tr. at 108).  He has no energy on bad days (Tr. at 108).  He has one to two panic attacks per week (Tr. at 108).  Plaintiff does not know what brings on a panic attack (Tr. at 108).  He feels like he is dying, he can't breathe, and he has to get out in the open, especially if he is around a lot of people (Tr. at 108).  It takes about 20 minutes for his symptoms to go away completely and then he feels okay (Tr. at 109).

Plaintiff is not social, and he has no hobbies outside the house (Tr. at 109).

Plaintiff tries to wash the dishes, but he forgets to finish those sometimes (Tr. at 110).  Sometimes he will try to help his wife get the dishwasher loaded but he has

45

forgotten to start it (Tr. at 110). He really does not do a lot (Tr. at 111). He does not go grocery shopping because he does not feel like getting out (Tr. at 111). If he goes with his wife, he will usually just sit in the car while she goes in (Tr. at 111). Plaintiff does not cook, but he did when he was younger (Tr. at 111). Plaintiff has not done any cleaning in a couple of years because it hurts to do it "and that's one of the reasons me and my wife are kind of split up right now." (Tr. at 111).

Plaintiff does not go to the doctor, because he can't afford to (Tr. at 111-112). He applied for Medicaid and was denied because "we're too high in the poverty bracket, basically. We're so poor, we can apply. We can qualify for everything except Medicaid" (Tr. at 112).

## 2. Testimony of George Horne, vocational expert.

Plaintiff's past relevant work includes parts clerk, semi-skilled and heavy, performed at the very heavy exertional level; lubrication servicer, semi-skilled medium, performed at the light exertional level; and commercial cleaner, unskilled heavy, performed at the light exertional level (Tr. at 114).

The first hypothetical involved a person who could lift and carry up to 10 pounds occasionally and up to 5 pounds frequently; stand and walk up to 2 hours per day; sit 6 to 8 hours per day; should avoid significant unprotected heights, potentially dangerous and/or unguarded moving machinery and commercial driving; would need an even surface upon which to stand and walk; should have no exposure to extreme vibrations; would need to avoid extremes of cold and humidity; would need to be able to wear foot gear of his choice; could not wear safety shoes or boots; would need to alternate sitting

and standing every 30 minutes but would not need to move away from the work station; would be limited to simple, repetitive one-, two-, or three-step instructions; would not have contact with the public; and could be in proximity to supervisors and co-workers but could not do teamwork-type duties (Tr. at 115-116). The vocational expert testified that such a person could not perform plaintiff's past relevant work but could work as a final assembler, DOT 713.687-018, with 1,000 jobs in Missouri and 50,000 in the nation, or a table worker, DOT 739.687-182, with over 800 jobs in Missouri and over 40,000 in the nation (Tr. at 117).

If the person would need to lie down twice a day for 30 minutes, the person could not work (Tr. at 118-119).

<u>July 27, 2010, hearing</u>

**1.    Plaintiff's testimony.**

Plaintiff's medication makes him very sleepy (Tr. at 67). His doctor said that is normal (Tr. at 67). He has been taking that medication daily for over eight years (Tr. at 67). Dr. Glynn prescribed a cane about four months earlier (Tr. at 68). Plaintiff has had no treatment for his hip other than pain medicine which is for his hip and back, and that was prescribed by his family doctor (Tr. at 73). The most recent x-rays of his hips were at least several years earlier (Tr. at 73). He last saw an orthopaedic specialist for his hip many years ago (Tr. at 73-74). Plaintiff has been taking 6 Hydrocodone pills per day for the past eight years (Tr. at 74). He has been taking 8 Oxycontin pills (15 milligrams each) per day for the past 6 months (Tr. at 74). Prior to that, he took 3 Oxycontin pills (40 milligrams each) per day for many years (Tr. at 75). He takes

47

Lorazepam for panic attacks (Tr. at 75). His pills are 2 milligrams each and sometimes he takes two or three per day (Tr. at 75). He takes Lexapro for depression (Tr. at 75).

Plaintiff last saw an orthopaedic surgeon about his back after his surgery which was about 8 years ago (Tr. at 75). They said there was nothing else they could do about it (Tr. at 75-76). He has never seen a neurosurgeon (Tr. at 76). He has not seen any specialist about his back in the last 8 years because he has not had the money (Tr. at 76). However, there are no referrals in the record to a specialist and plaintiff testified that he had not been referred for any specialized care with an orthopaedic surgeon or neurosurgeon (Tr. at 86).

**2. Medical expert testimony.**

Arthur Lorber, M.D., tested at the request of the Administrative Law Judge. He identified plaintiff's medically determinable impairments as follows: Plaintiff has a deformity at the head and neck of the right femur which is related to old Legg Perthes disease which occurred in childhood, history of excision of a lipoma from the left heel in February 2003, and abnormalities at L4-5 and L5-S1 level (Tr. at 72). There were no records from any doctor prescribing a cane (Tr. at 72).

Legg Perthes disease occurs in childhood and the femoral head dies, but it can reform and when it reforms it frequently reforms in a deformed shape (Tr. at 77). Over time because the shape of the femoral head is abnormal, degenerative arthritis may occur (Tr. at 77). Plaintiff may have degenerative arthritis in his right hip, but there was insufficient information -- a thorough examination by an orthopaedic surgeon is necessary and x-rays as well as possible a CT scan or MRI would be needed to make

Case 6:12-cv-03203-REL   Document 17   Filed 09/21/13   Page 48 of 60

that determination (Tr. at 77-78). If plaintiff does have degenerative arthritis in his right hip, that has only been in the last six months because before that he was able to walk without a cane, and it can be corrected with a total hip arthroplasty, so there is a durational issue (Tr. at 78). There is no evidence that his childhood condition has progressed other than his subjective complaints (Tr. at 82). There is "absolutely no evidence of Arachnoiditis. It is highly unlikely that it would suddenly develop after all these years. So his general practitioner may have made a very bold statement concerning a very serious diagnosis but he provides no evidence to prove such a thing." (Tr. at 83-84). Arachnoiditis can only be determined by imaging studies such as an MRI and CT scan, it cannot be determined even with x-rays (Tr. at 84). As far as his back, an MRI would not be helpful because he has metal in his spine which would nullify any findings on MRI (Tr. at 85).

Plaintiff's impairment in his lumbar spine is significant but does not meet a listed impairment because there is no evidence of ongoing focal neurologic deficit (Tr. at 76). Although Dr. Glynn assessed failed back syndrome with nerve root compression, there is no evidence to support that diagnosis (Tr. at 80-81). The only evidence to support the diagnosis is positive straight leg raising, but Dr. Glynn did not describe whether it had been done both supine and sitting, so that test is not valid (Tr. at 81). Limited range of motion in the spine is not evidence of focal neurologic deficit -- that would be expected with a two-level lumbar fusion.

Plaintiff is taking a large amount of narcotic medication but he has been taking it for quite a long time (Tr. at 78). The human body develops a tolerance to these

medications over time (Tr. at 78). The medication could cause plaintiff to be somewhat drowsy but Dr. Lorber could not say that for sure (Tr. at 78). If one were to begin taking that large a dose of narcotics all of a sudden, there would be many side effects, but over time they would diminish as the body became tolerant (Tr. at 78-79).

Dr. Lorber's opinion is that plaintiff could lift 10 pounds occasionally and 5 pounds frequently; he could carry 10 pounds occasionally; he could never carry any weight frequently; he may occasionally bend, stoop or crouch; he should not kneel, crawl or balance; he should not work at unprotected heights; he should not climb ladders, scaffolds or ropes. He may occasionally ascend stairs or ramps; he should avoid exposure to all vibrations; he should not work on slippery, wet or grossly uneven surfaces. He should not drive or operate machinery (Tr. at 76-77, 79).

September 30, 2010, hearing

**1.     Plaintiff's testimony.**

Since the last hearing, plaintiff's doctor prescribed Fentanyl patches, 25 milligrams, and he is going to start slowly going off the Oxycodone (Tr. at 39). Plaintiff sees his regular family doctor, Dr. Glynn, for depression (Tr. at 42-43). Plaintiff saw Dr. Dimalanta, a psychiatrist, for about a year but does not see him anymore because he does not have any insurance and does not have the money to pay him (Tr. at 43). Plaintiff is on Medicaid and he has never lost his Medicaid coverage[13] (Tr. at 43). "The referral or the funding was cut and all the psychiatrists were either quitting or going on

---

[13]Although plaintiff testified he had never lost his Medicaid coverage, he stated at the earlier hearing that he "recently" got Medicaid coverage when he was awarded SSI (Tr. at 86, 87).

and he was getting over staffed and I hadn't been able to get back with a psychiatrist."
(Tr. at 43). Plaintiff's depression causes him to not want to wake up some days (Tr. at 43). He cries once in a while (Tr. at 43). On plaintiff's worst days, he thinks about suicide all the time (Tr. at 44). About twice a week plaintiff has a bad day like that (Tr. at 44). He just stays home and watches television (Tr. at 44). He is able to focus and follow TV shows all the way through sometimes, but other times things on television look "so real" (Tr. at 44). Plaintiff has not been able to get in to see a counselor yet (Tr. at 44). He has tried a little bit, but he does not have the drive to do it (Tr. at 44-45). Dr. Glynn just prescribes Lexapro for depression and Lorazepam for panic attacks (Tr. at 45).

Plaintiff's panic attacks make him feel like he is going to pass out, it feels like he can't breathe, his chest starts hurting (Tr. at 45). He has a panic attack about every other week and they last 20 to 30 minutes and then he feels fine again (Tr. at 45). Plaintiff's panic attacks occur randomly (Tr. at 45-46). Plaintiff has been dealing with these for over 20 years (Tr. at 46).

Sometimes when plaintiff goes into large stores with crowds, he feels uncomfortable and has to leave (Tr. at 46). Plaintiff's depression is caused by his pain, not having any income, not being a father to his kids, and not being able to provide for his kids and himself (Tr. at 46). On days when plaintiff has really bad pain and is very depressed, he wants to put a bullet through his skull (Tr. at 46).

Plaintiff started experiencing left shoulder pain and his fingers are going numb (Tr. at 57-58). His arm has gotten weaker and he cannot use it very well (Tr. at 58).

This all started a little under two months ago (Tr. at 58).

Plaintiff's pain is in his lower back and it radiates into his legs (Tr. at 47). On bad days, the pain is in his back and his hip (Tr. at 47). If his back is hurting "real bad," it hurts to stand up (Tr. at 47). He cannot lie down on his right side if his hip is hurting, and he cannot lie on his back if his back is hurting (Tr. at 47). He has to "flip and flop and stand and sit" until he can find a comfortable position (Tr. at 47). Rain and cold weather exacerbate plaintiff's condition (Tr. at 47). Plaintiff cannot sit for long, but he did not indicate how long he actually can sit (Tr. at 47). If the chair is soft, he can sit longer than if the chair is hard (Tr. at 47). On good days he can stand for about 45 minutes at a time, but on bad days he has to support himself by leaning against something (Tr. at 48). Plaintiff has a cane that he uses on bad days (Tr. at 48). He uses it maybe two to four times a week (Tr. at 48). He does not like using it -- it makes him feel old (Tr. at 48).

Plaintiff lives in a small apartment in the back of his sister's house (Tr. at 48). There are no stairs to get to his home (Tr. at 48). He does not cook because he doesn't know how (Tr. at 48-49). He tries to pick up his clothes and sweep a little bit (Tr. at 49). Plaintiff's sister takes his dishes into her house and puts them in her dishwasher (Tr. at 49).

It is hard for plaintiff to get mentally motivated to take a shower (Tr. at 49). It is hard for him to put socks on, but he can get dressed (Tr. at 49). On a typical day, he sits around and watches television all day (Tr. at 49).

## 2.    Medical expert testimony.

Arthur Lorber, M.D., tested at the request of the Administrative Law Judge.  After reviewing the new evidence obtained between the date of the last hearing and the second hearing, Dr. Lorber has not changed his earlier opinions (Tr. at 37).  Plaintiff would be able to lift and carry 10 pounds occasionally and 5 pounds frequently (Tr. at 37-38).  As a result of plaintiff's medications, Dr. Lorber's opinion is that plaintiff should not have exposure to concentrated vibration; no frequent bending or stooping; no crawling or kneeling; no working at unprotected heights; no climbing ladders, scaffolds or ropes; he could ascend stairs or ramps (Tr. at 38).  Due to his use of narcotic pain medication, plaintiff should not drive (Tr. at 38-39).

Due to plaintiff's Legg Perthes disease and according to the hip x-ray, Dr. Lorber would not object to him using a cane for prolonged distance or prolonged walking, but plaintiff would not need the cane otherwise (Tr. at 40).  There were no significant differences between the recent hip x-ray and the one from February 2003 (Tr. at 40-41). The reference to vacuum phenomenon means that there is some gas within the joint (Tr. at 41-42).  Gas in the joint is not a severe finding and does not add any additional limitations to an arthritic hip (Tr. at 42).

## 3.    Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.  Plaintiff's past relevant work includes parts clerk, heavy work, semiskilled, performed at the very heavy exertional level; lubrication services, medium work semiskilled, performed at the light level (Tr. at 51).

The first hypothetical involved a person who could lift and carry up to 10 pounds occasionally and up to 5 pounds frequently; stand and walk up to 2 hours per day and up to 30 minutes at a time; sit for 6 to 8 hours per day; must have the ability to alternate sitting and standing at 30 minute intervals but would not need to move away from the work station; could never crawl or kneel; should avoid unprotected heights, dangerous machinery and commercial driving; could go up three steps; should avoid uneven surfaces; should have no exposure to extreme vibration or extremes of cold and humidity; no use of foot controls; must have only simple repetitive job instructions with up to three steps, no public contact, and no more than minimal contact with co-workers and supervisors -- although proximity to those individuals in the work setting would be allowed, team work duties would be excluded (Tr. at 52-53). The vocational expert testified that such a person could work as a production assembler, DOT 706.687-010, with 1,000 such jobs in Missouri and 50,000 in the country; a general clerk, DOT 209.562-010, with 3,200 in Missouri and 165,000 in the country (Tr. at 53).

The second hypothetical was the same as the first except the person would need to use a cane in the right dominant hand for walking, but not standing still (Tr. at 54). The vocational expert said, "I guess as long as the individual doesn't have to actually work or use that hand for an entirety of the work." (Tr. at 54).

If a person had the limitations listed in the Medical Source Statement of Dr. Glynn or the Medical Assessment Mental of Dr. Dimalanta, the person would be unemployable (Tr. at 58-59).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Linda Carter entered her opinion on October 21, 2010 (Tr. at 11-24).  Plaintiff's last insured date was March 31, 2007 (Tr. at 14).

Step one.  plaintiff has not engaged in substantial gainful activity since his alleged onset date, March 31, 2003 (Tr. at 14).  Plaintiff has earned income in 2003 and 2005; however, his earnings do not rise to the level of substantial gainful activity (Tr. at 15).

Step two.  Plaintiff has the following severe impairments:  history of multi-level fusion, history of Leggs Perthes (chronic deformity of the right femoral head) with arthritic changes, history of excision plantar lipoma left heel, history of major depression, panic disorder with agoraphobia with current treatment for anxiety, and history of a diagnosis of fibromyalgia (Tr. at 15).  Plaintiff's hypertension does not have more than de minimus effect on plaintiff's ability to perform substantial gainful activity and is therefore non-severe (Tr. at 15).  However, the ALJ did consider plaintiff's hypertension when assessing his residual functional capacity (Tr. at 15).  Plaintiff's left shoulder pain is unsubstantiated in the medical evidence, despite a diagnosis of degenerative joint disease of the left shoulder (Tr. at 15).  Therefore, the ALJ determined that plaintiff's shoulder pain is not a medically determinable impairment (Tr. at 15).  Even if the shoulder pain were substantiated, the evidence, including plaintiff's own testimony, establishes that the pain did not meet the 12-month duration requirement of the Act (Tr. at 15).

Case 6:12-cv-03203-REL   Document 17   Filed 09/21/13   Page 55 of 60

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15-17).

Step four.  Plaintiff has the residual functional capacity to perform sedentary work except that he can lift up to 10 pounds occasionally and 5 pounds frequently; stand and walk up to 2 hours but no longer than 30 minutes at a time; sit for 6 to 8 hours per day; should be able to alternate sitting and standing at 30-minute intervals without moving away from the work station; can never crawl or kneel; should avoid climbing or exposure to significant unprotected heights; can go up no more than three steps at a time; should avoid potentially dangerous and/or unguarded moving machinery and commercial driving; cannot walk on uneven surfaces; can have no exposure to extreme vibration; should avoid extremes of cold and humidity; can not use foot controls; must have the ability to wear shoes of his choice but exclude safety boots; must have a cane for walking; and is limited to simple repetitive job instructions with no public contact and no more than minimal contact with co-workers and supervisors, i.e., proximity would be permitted but teamwork duties and responsibilities would be excluded (Tr. at 17).  In making this determination, the ALJ found plaintiff's subjective complaints of disabling limitations to be inconsistent and not credible (Tr. at 18).  With this residual functional capacity, plaintiff cannot perform any of his past relevant work (Tr. at 23).

Step five.  Plaintiff was 34 years old on his alleged onset date, which is a younger individual under the regulations (Tr. at 23).  Given his age, education, work experience, and residual functional capacity, he is capable of performing other jobs

available in significant numbers, such as production assembler or general clerk (Tr. at 23-24). Therefore, plaintiff was found not disabled at the fifth step of the sequential analysis.

## VI.    OPINIONS OF DR. GLYNN AND DR. DIMALANTA

Plaintiff argues that the ALJ erred in discounting the opinions of Dr. Glynn and Dr. Dimalanta in the Medical Source Statements quoted above. Plaintiff states that the ALJ's "arbitrary statements are not supported by overall evidence of record" -- on the contrary, the ALJ's findings are supported by the substantial evidence in the record. The Medical Source Statements contain opinions which were arbitrary and are not supported by anything in this record.

A lengthy discussion is not necessary here -- a review of the medical records above establishes that the Medical Source Statements contain opinions that are so far from consistent with the treatment records that a plausible argument that they are entitled to any weight is not possible.

Dr. Glynn found that plaintiff could stand, walk and sit for a combined total of 3 hours per day, that he needs to lie down for 6 to 7 hours per day, and that the sedating side effects of his medication affect his coordination. Yet, Dr. Glynn never performed any examination of plaintiff except on his elbow, which is not one of plaintiff's complaints in this case. He never observed any abnormalities other than on one occasion right after plaintiff applied for disability benefits. On that day, plaintiff was observed standing when Dr. Glynn came into the exam room, and he was observed getting in and out of the chair using his arms for assistance. However, four years after

57

that observation, Dr. Ash observed that plaintiff had no difficulty getting in and out of his chair.  The year after Dr. Glynn first stated that in his opinion plaintiff is disabled, plaintiff admitted to Dr. Glynn that he had been mowing the lawn and using a weed eater.  There is not one other abnormal observation in Dr. Glynn's treatment notes unless he was responding in connection with plaintiff's disability cases.  In almost every medical record -- dozens of records -- Dr. Glynn observed that plaintiff was doing fine, had no new issues, was feeling good.  There is absolutely no basis for his opinion in the Medical Source Statement and the limitations set forth in that Medical Source Statement contradict all of Dr. Glynn's treatment records.  The opinion in the Medical Source Statement deserves no weight and the ALJ properly so found.

Dr. Dimalanta's opinion with respect to plaintiff's mental limitations is likewise wholly unsubstantiated.  During the entire course of plaintiff's treatment with Dr. Dimalanta, his medication provided good control of his mental symptoms.  His medication was rarely changed, and plaintiff's mental exams were consistently normal in all respects.

The evidence establishes that plaintiff was home watching television all day and taking care of his four children, which is no small task.  He stated that he was fine with his wife working while he stayed at home.  The only side effect of his medication that appears in any of his treatment records deals with a decreased sex drive, and his doctor even surmised that the decreased sex drive was caused by plaintiff's relationship issues and not his medication.  Plaintiff continued to smoke up to two packs of cigarettes per day -- a very expensive habit -- while claiming not to have the money to

explore any treatment other than continued heavy use of narcotic pain medication. The records are clear that despite plaintiff being addicted to his medication, Dr. Glynn was perfectly agreeable with continuing plaintiff on those medications for years and made consistent notations that plaintiff was doing well on that treatment regimen. He never recommended any other treatment which is consistent with his treatment records indicating that plaintiff was doing fine on his medication.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

As discussed above, the opinions in the Medical Source Statements are not supported by medical signs or laboratory findings (in fact, they contradict the medical signs and laboratory findings), they are not consistent with the treatment records or the

record as a whole, and they are inconsistent with plaintiff's daily activities of taking care of his children and performing more in the way of outdoor work than he admitted to during the hearings.  The ALJ properly gave no weight to these opinions.

## VII.   CONCLUSIONS

Plaintiff also argues that the ALJ erred in finding his testimony not credible.  A comparison of plaintiff's testimony to the other evidence summarized above indicates that this argument is wholly without merit.  The substantial evidence in the record as a whole supports the ALJ's finding with regard to plaintiff's residual functional capacity.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 20, 2013